

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-30-2009

# Inst Inv Grp v. Avaya Inc

Precedential or Non-Precedential: Precedential

Docket No. 06-4595

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Inst Inv Grp v. Avaya Inc" (2009). *2009 Decisions.* Paper 1418.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1418

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 06-4595

_____

INSTITUTIONAL INVESTORS GROUP, Lead Plaintiff;
HOWARD CHARATZ, individually and on
behalf of all others similarly situated,

Appellants

v.

AVAYA, INC.;
DONALD K. PETERSON; GARRY K. McGUIRE, SR.

_____

On Appeal from the United States District Court
for the District of New Jersey
D.C. Civil Action No. 05-cv-2319
(Honorable Mary L. Cooper)

_____

Argued March 3, 2008

Before:  SCIRICA, *Chief Judge*,
FISHER and ROTH, *Circuit Judges*.


(FiledL: April 30, 2009)

SANFORD SVETCOV, ESQUIRE (ARGUED)
Coughlin Stoia Geller Rudman & Robbins
100 Pine Street, Suite 2600
San Francisco, California 94111
        Attorney for Appellants


STEVEN M. SCHATZ, ESQUIRE (ARGUED)
Wilson Sonsini Goodrich & Rosati
650 Page Mill Road
Palo Alto, California 94304


KERRI E. CHEWNING, ESQUIRE
Archer & Greiner
One Centennial Square
P.O. Box 3000
Haddonfield, New Jersey 08033
        Attorneys for Appellees

_____

OPINION OF THE COURT

_____

SCIRICA, *Chief Judge*.

This is a shareholders securities action, putatively a class action, alleging defendants made false or misleading statements about earnings growth potential and pricing pressure in violation of the Securities and Exchange Act of 1934. Shareholders' central theory is that investors and analysts viewed the key to Avaya's success to be its ability to increase sales revenues without cutting prices. The District Court granted defendants' motion to dismiss for failure to meet the pleading requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA). We will affirm in part and reverse in part and remand for proceedings consistent with this opinion.

**I.**

Defendant Avaya Inc. sells communications products and services.[1] Shareholders allege Avaya, through its Chairman and CEO, defendant Peterson, and its CFO, defendant McGuire, (1) affirmatively denied unusual price competition was occurring during the class period, despite knowing there was price

---

[1] During the relevant period, its Chairman and Chief Executive Officer was Donald Peterson, and its Chief Financial Officer and Senior Vice President of Corporate Development was Garry McGuire. The allegations in this case all involve the 2005 fiscal year; Shareholders propose a class period running from October 26, 2004, to April 19, 2005 (the company's fiscal year ends on September 30).

competition that was hurting profit margins; and (2) issued baseless financial projections and positive portrayals to the market despite knowing the projections and portrayals were impossible to fulfill in light of intense price competition and problems with the company's "go-to-market" (GTM) strategy.[2] Shareholders support their claims through a variety of circumstantial allegations of falsity and knowledge, including the accounts of confidential witnesses (CWs), analyst reports, and alleged "admissions" by Peterson and McGuire.

Statements during three separate portions of the class period form the basis of Shareholders' claims: (1) in late October 2004, after the start of Avaya's 2005 fiscal year

---

[2]For purposes of background explanation, we note that, according to Avaya's SEC filing, the GTM strategy "realign[ed] our sales and marketing efforts by expanding direct sales coverage of key accounts; by enlarging the number of strategic accounts; by identifying a second tier of named accounts served by a combination of our direct sales team and our channel partners; and by servicing our medium and small business customers primarily through our channel partners. This had the result, among other things, of reassigning accounts among different channels and sales teams." Avaya Inc., Quarterly Report for the Period Ended March 31, 2005 (Form 10-Q), at 35 (May 10, 2005), *available at* http://idea.sec.gov/Archives/edgar/data/1116521/0001104659 05021893/a05-8780_110q.htm.

(FY2005), Avaya, through Peterson and McGuire, announced results for FY2004 and made projections for FY2005; (2) in late January 2005, Avaya announced results for the first quarter of FY2005 and made positive portrayals; (3) in the first two weeks of March 2005, McGuire allegedly increased his revenue projections for FY2005 and made false or misleading comments about the state of Avaya's business. All of the statements fall into one of two general categories. First, there are "pricing-pressure statements," in which McGuire and Peterson are alleged to have falsely denied Avaya was offering unusual discounts and facing significant pricing pressure from market rivals. Second, there are "forecast-related statements," in which defendants projected financial results (such as operating margin and revenue growth) and made positive portrayals, notably the statement that Avaya was "on track" to achieve its goals or projections.

The Complaint alleges the following facts.[3]

**A.**

On October 26, 2004, Avaya released financial results for FY2004 and the fourth quarter of 2004 (Q4 FY2004), which had ended September 30, 2004. A press release stated in part: "We

---

[3]Where the Complaint refers to other documents, we draw on information in those documents beyond what is directly quoted in the Complaint. *See infra* Section II.C (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007)).

5

have entered the new year well positioned to translate our ongoing success in the marketplace into enhanced shareholder value." In a conference call for analysts and investors, Peterson elaborated: "Clearly we are enjoying significant momentum in the marketplace, and we are converting that momentum into increased profitability and financial strength. Underlying this momentum are our Company's strategic advantages." Peterson added that "[t]he end result is that today we are a stronger more competitive organization that enjoyed [sic] significant potential . . . to further build shareholder value." When asked about prospects for operating margins, McGuire said he expected continued improvement in FY2005. Peterson commented on pricing: "I'd say pricing as a general comment is not different than what it has been. There continues to be . . . pressure in the market, it's a very competitive marketplace but I wouldn't say there's anything particularly noteworthy in the trend line one way or the other."[4]

_____

[4]The Complaint alleges analysts reported optimistically on the results and management's statements, focusing especially on the strong expected gross and operating margins for FY2005. A JP Morgan analyst stated "management indicated that not only are the margins likely sustainable but, in fact, there is room for additional expansion," and "[p]ricing pressure remains under control." "Management noted that no unusual pricing pressure in the quarter affected margins, and while they expect pricing to continually decline, the shift towards products such as higher-margin IP software would benefit Avaya's gross margin." A

6

On October 29, Avaya issued a set of financial projections. For FY2005, the company projected an operating margin[5] of 8.5% to 9% and revenue growth of 25% to 27%. For FY2006, it projected an operating margin of 10% to 12%. McGuire and Peterson spoke at a conference and made positive portrayals, focusing particularly on the 8.5% to 9% estimate for operating margin.

On January 25, 2005, defendants announced Avaya's financial and operational results for Q1 FY2005. The results were "in line with, or better than, analysts' expectations." First quarter operating income grew 70% year-over-year and the

---

Prudential analyst reported the statements by McGuire, characterizing them as follows: "While competitors have cut prices and may have sacrificed margins on some individual deals, [Avaya] remains committed to growing its share profitably, and it is not seeing any widespread change in the telephone pricing environment." The analyst added that Avaya "believes these margins are sustainable."

[5]Operating margin is determined by dividing operating income by total revenue. Operating margin measures the proportion of a company's revenue left over after paying for variable costs (e.g., wages, raw materials, etc.). It gives investors and analysts an indication of how much a company makes on each dollar of sales (before interest and taxes).

7

gross margin percentage[6] was 47.3%. Total revenues grew 18% compared with Q1 FY2004.[7] Notably, defendants stated: "Our first quarter results position us to meet our goals for the year"; and "we are on track to meet our goals for the year, even though there were some aspects of our performance that are below our expectations and that we are working on to improve."[8]

During a conference call with analysts, Peterson reiterated Avaya's FY2005 expectations:

> Growing revenue 25 to 27 percent. Increasing operating income by 40 percent. Increasing our annualized margin to the 8.5 to 9 percent range,

---

[6]Gross margin percentage equals: Revenue minus Cost of Goods Sold, divided by Revenue. The gross margin represents the percent of total sales revenue the company retains after incurring the direct costs associated with producing the goods and services sold by the company.

[7]Excluding the impact of two business acquisitions—Tenovis and Spectel—revenues grew 5% compared to Q1 FY2004.

[8]*See also* Statement of Don Peterson, Chairman and CEO, Avaya, Q1 2005 Avaya Earnings Conference Call (Jan. 25, 2005) ("While our results put us in line to achieve our goals for the year, there are some elements to our performance that we are focused on improving. Product sales in the U.S. were not up to our expectations.").

8

which would put us on the trajectory to go beyond that in 2006. All those things are on track. We do have a business that is somewhat more seasonal in its pattern than some of our data industry brethren, and this is a fall-over or holdover of the telecom business even though these things are merging in IP telephony. But we think that we had a solid quarter that is positioning us well to go on through the rest of the year and achieve those goals.

We will obviously report to you as we make that progress at the very least in our quarterly results. And if there is something particularly important, we will come to you before that, but otherwise assume that we are on track and going to make that—going to deliver on those promises as the year goes on.

On March 2, 2005, McGuire adjusted Avaya's projected annual revenue growth to 28%[9] and noted that "we are building on the momentum that we've got in the market relative to the technology lead, our applications, . . . and our global services." In response to analyst inquiries about the effect of pricing

---

[9]The increase in projected revenue growth was due to the earlier-than-predicted completion of the acquisition of Tenovis. The acquisition allowed Avaya to recognize an additional 3% of revenues in 2005 for that "stub" period.

9

pressure from Cisco, McGuire stated that Cisco is "a good competitor . . . to have relative to the pricing environment. . . . [I]f they start a price war in IP telephony, they're only going to further exacerbate the pressure they've got on gross margins. So in that regard, I kind of view them as a nice competitor to have because that's a problem they've got to live with." Similarly, on several occasions in March, McGuire said there were no significant changes to the pricing environment. *See* Statement of Garry McGuire, CFO, Avaya, Fourth Annual JMP Securities Research Conference (Mar. 2, 2005) ("Pricing environment is not significantly different. I mean, there are people that will buy a deal from time to time, but in general, the pricing environment is—has been fairly stable."); Statement of Garry McGuire, CFO, Avaya, Morgan Stanley Semiconductor and Systems Conference (Mar. 7, 2005) ("[C]learly from time to time people will want to buy a deal here or there, but the market itself has been fairly stable with just modest declines over the last 12 months."); Statement of Garry McGuire, CFO, Avaya, Deutsche Bank Securities Inc. IT Hardware Conference (Mar. 10, 2005) ("Pricing has been fairly steady for the last couple of years. . . . I don't see any reason that that would change significantly. I think that in the last year or so, it has really been a 2-horse race with us and Cisco in the IP telephony area.").

Also in March, analyst reports identified potential obstacles faced by Avaya. On March 4, 2005, members of the Buckingham Research Group performed a sales channel check and concluded that Avaya was experiencing "weak" spending

10

for its products and had fired sales staff in order to cut costs. The analysts predicted Avaya's actions would "negatively effect [sic] growth." In addition, a March 21, 2005, Equity Research Update by Lehman Brothers analysts reported that Avaya resellers had indicated that the company was "offering aggressive [30–40%] discounts for its mid-range products (150–400 lines) since [the] beg[inning] of March [2005]."[10] Lehman Brothers characterized the discounts as "quite unusual" and warned that if the promotion were highly successful, "Avaya's product margins would be somewhat impacted."

On April 19, 2005,[11] Avaya announced that it would be unable to meet its previously stated goals for growing revenues, operating income, and operating margin in FY2005. Avaya's Q2 FY2005 revenues increased 21% compared to the revenue in Q2 FY2004. The revenue growth "reflected the impact of Avaya's recent acquisitions and revenue growth internationally." But "U.S. product and services revenues declined year-over-year." On April 20, 2005, Avaya's stock price dropped

---

[10]The report indicated that "[w]hile accurate industry data is hard to obtain, we estimate sales of 150–400 line systems constitute a significant portion of the enterprise telephony industry sales."

[11]As noted, Q2 FY2005 ended on March 31, 2005.

approximately 25%—from $10.69 to $8.01.[12]

Peterson blamed internal problems, especially the GTM strategy, for the missed benchmarks. *See* Statement of Don Peterson, Chairman and CEO, Avaya, Q2 2005 Avaya Earnings Conference Call (Apr. 19, 2005) ("[W]ell over a majority of this shortfall I would attribute more to issues related to us than issues related to the market. . . . I think most of this [sic] are things that if I have to get to and fix and therefore they're within our control and we will fix them and get back on track."); *id.* ("The implementation of our new go-to-market strategy . . . is taking longer and has been somewhat more disruptive than we had envisioned. While we still believe it is the right strategy and it will ultimately strengthen our presence in the marketplace it has in the short-term negatively affected our direct sales in the U.S.").

McGuire noted that during the first two months of the second quarter, Avaya was "tracking slightly at or just a little bit below the quarter before" and was "track[ing] well for March closure both on the indirect and the direct side." According to McGuire, "all of the indicators that we had gave us comfort that that would come through." But Avaya was "caught . . . by surprise in the last week" of the quarter when distributors decided not to "reload" at the rates they had done in the past and when Avaya was unable to close several deals during the

---

[12]On April 20, 2005, the S&P 500 dropped 1.3% and the Dow Jones Industrial Average dropped 1.1%.

quarter.

Also, in response to questions about discounting, McGuire stated: "There is no new specific discounting policy we put in place. I can tell you that our discounts were relatively black or improved in most parts of the world, except for international direct where they were up slightly." During a conference call with Merrill Lynch on April 28, 2005,[13] McGuire was asked about "some reports published recently saying that Avaya gave a 30% to 40% discount in the first quarter." McGuire responded: "Now, I hear the noise that, yes, we were out with a 30% to 40% discount on a program in last quarter. . . . [I]t's not unusual . . . . And quite frankly, a 30% to 40% discount is not out of the norm for any of these programs."

**B.**

Based on the following "true facts," Shareholders allege a "two-pronged fraud scheme to increase Avaya's stock price."

---

[13]Although Shareholders' proposed class period ran from October 26, 2004, to April 19, 2005, the April 28 statements may be relevant. *See In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) ("[B]oth post-class-period data and pre-class data could be used to 'confirm what a defendant should have known during the class period'" because "'[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant.'" (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001))).

Shareholders' Br. 5.  First, Shareholders allege that, beginning in October 2004, and continuing throughout the class period, defendants denied that Avaya was offering unusual price discounts and that its profit margins were being impaired. Shareholders contend the "true facts" show Avaya was in fact encountering serious pricing pressures and was forced to grant unusually large discounts in negotiations with clients, which would manifest themselves in less-profitable contracts booked in subsequent quarters (since the negotiation process "regularly lasted months"), eviscerating margins.  Second, Shareholders allege the financial projections Avaya released on October 29, 2004, and reaffirmed in January and March 2005, were false or misleading.  According to Shareholders, defendants knew the projections could not be achieved because of unusual pricing discounts and declining sales due to Avaya's sales force realignment under the GTM strategy, which impaired both earnings and revenues.

CW3 is a confidential witness and former Global Contract Manager who worked at Avaya "for many years prior to leaving in November 2004" and who "participated in the negotiation of contracts with many of Avaya's biggest clients," including work on the top forty accounts in the U.S.  According to CW3, "Avaya's operational model had essentially broken down" in the months prior to his November 2004 departure, "resulting in Avaya's inability to compete with the business models of rivals in the industry such as Cisco and AT&T Solutions."  CW3 asserts it was "well-recognized within Avaya

14

that its business model faced significant problems" and that its inability to compete with an "outsourcing" product offered by AT&T Solutions allowed numerous large clients, such as Merrill Lynch and Citigroup, to pressure Avaya "as a means of winning substantial price concessions." Citigroup allegedly forced Avaya to accept a 20% price reduction with no change in services because Avaya feared losing Citigroup to AT&T Solutions's "outsourcing" product. In the months leading up to the beginning of the class period, CW3 contends "defendants realized Avaya's margins on business with relatively small accounts . . . had substantially declined," so that it had become unprofitable to negotiate such contracts. Avaya shifted to a policy of non-negotiation on those accounts, leading to a decline in business as Avaya lost those accounts to competitors.

CW4 is a former Avaya employee "who was at the Company prior to and throughout the Class Period and who was responsible for evaluating the profitability of special bids in the Services organization," which allegedly provided half of Avaya's revenues. *See* Shareholders' Br. 11. According to CW4, "Avaya gave substantial discounts to win business in the period leading up to the beginning of the Class Period through May 2005." The customers receiving such discounts were among Avaya's largest. CW4 provided the names of four of the customers. CW4 stated that, historically, Avaya gave 20% discounts to 20% of its special bid customers. But between January and May 2005, at the request of the sales force, Avaya management gave 20% discounts to 80% of its special bid

15

customers. In 2004 and 2005, "Avaya was facing substantial competition from newer companies that were aggressively pursuing Avaya's customers by competing on price."[14] "[I]n many instances Avaya was granting price concessions in excess of 30%–40% in order to win business . . . ."[15] Finally, CW4 contends, Avaya inherited a number of low-margin contracts from its acquisition of a company called Expanets in October 2003. This problem allegedly continued throughout the class period, and by March 2005, Avaya was "happy to merely break even on such contracts."

CW5, a former Senior Client Executive at Avaya from 2001 until March 2004, said Avaya's GTM strategy had begun in October 2003 and involved reassigning Client Executives from larger "enterprise" accounts to "mid-market" accounts.

---

[14]According to CW4, one such company, United Assets Coverage, specifically targeted customers who received Avaya's Maintenance Software Permission product. In October 2004, "defendants learned about United Assets Coverage's tactic to target Avaya customers."

[15]CW6, an independent Avaya sales manager who sold Avaya products but was not employed by the company, confirmed that in March 2005, Avaya was cutting prices on some of its mid-range systems. According to CW6, "Cisco was attacking Avaya on price and hurting Avaya in the small and midsized business markets."

CW5 realized in October 2003 that the GTM strategy would cause "a substantial loss of business already in the pipeline." The effect of the GTM strategy was that "many customers lost confidence and trust in Avaya and certain large sales were lost." For example, CW5 allegedly lost $7 million in sales through 2004, "including lucrative contracts with ACS in Utica, New York for $1.5 million and a $750,000 deal with Alcoa." According to CW5, these and other similar FY2004 losses attributable to the GTM strategy "were to have a substantial impact on Avaya's financial results during the Class Period" because Avaya's "sales cycle" for enterprise accounts ranged from six months to a year and a half.

Two CWs (a former Director of Operations for Global Solutions Sales and Support and a former Senior Client Executive) claimed McGuire established the financial projections on a "top-down basis," meaning he did not solicit input from salespeople. The resulting forecast was allegedly "dictated" from the top and was not realistically attainable. Finally, according to CW3, Avaya fired employees in September 2004 "specifically because the Company's business was not doing well," demonstrating that despite the "positive spin" Peterson and McGuire issued in October 2004, internally they were "taking drastic steps to reduce costs" in order to meet the projections.

## II.

The District Court granted defendants' motion to dismiss

17

under the Private Securities Litigation Reform Act (PSLRA) for three reasons: (1) some statements defendants allegedly made were "forward-looking" and protected under the PSLRA's Safe Harbor provision; (2) other alleged statements were not actionably false or misleading; and (3) with respect to remaining statements that may have been actionable, Shareholders failed to plead facts giving rise to a strong inference of scienter as the PSLRA requires. *See Charatz v. Avaya, Inc.*, No. 05-2319 (MLC), 2006 WL 2806229, at *12–20 (D.N.J. Sept. 28, 2006). Shareholders timely appealed.[16]

We exercise plenary review over the District Court's dismissal of the Complaint for failure to meet the pleading requirements of the PSLRA and over the District Court's interpretation of the federal securities laws. *Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007).

## A.  Section 10(b) and Rule 10b-5

Section 10(b) of the Securities Exchange Act of 1934 prohibits the "use or employ[ment], in connection with the purchase or sale of any security . . . , [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."  15 U.S.C.

---

[16]The District Court had jurisdiction over Shareholders' federal securities fraud claims under 28 U.S.C. § 1331 and 15 U.S.C. § 78aa.  We have jurisdiction over this appeal from the District Court's final order of dismissal under 28 U.S.C. § 1291.

18

§ 78j(b). Rule 10b-5, promulgated by the Securities and Exchange Commission, makes it unlawful

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim for securities fraud under Rule 10b-5, plaintiffs must "allege defendants made a misstatement or an omission of material fact with scienter in connection with the purchase or the sale of a security upon which plaintiffs reasonably relied and plaintiff's [sic] reliance was the proximate cause of their injury." *Winer Family Trust*, 503 F.3d at 326. Although Shareholders' Complaint focuses on the statements of McGuire and Peterson, liability for these statements, if they were fraudulent, can also be imputed to Avaya because "[a] corporation is liable for statements by employees who have apparent authority to make them." *Makor Issues & Rights, Ltd. v. Tellabs Inc.* (*Tellabs II*), 513 F.3d 702, 708 (7th Cir. 2008)

19

(citing *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 568 (1982); *In re Atlantic Fin. Mgmt., Inc.*, 784 F.2d 29, 31–32 (1st Cir. 1986)).

Avaya does not dispute that the following elements of the cause of action are properly pleaded: materiality, reliance, loss causation, and damages. Falsity and scienter are disputed. With respect to falsity, Shareholders must specify each allegedly misleading statement and the reasons why the statement is misleading. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2508 (2007). Scienter is a "mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976), and requires a knowing or reckless state of mind, *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 534–35 (3d Cir. 1999).

**B. Section 20(a)**

Section 20(a) of the Securities Exchange Act of 1934 creates a cause of action against individuals who exercise control over a "controlled person," including a corporation, that has committed a violation of Section 10(b). 15 U.S.C. § 78t(a); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006). Accordingly, liability under Section 20(a) is derivative of an underlying violation of Section 10(b) by the controlled person. *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004) ("[P]laintiffs must prove not only that one person controlled another person, but also that the 'controlled person' is liable under the Act." (internal quotation

20

marks omitted)). Shareholders allege the individual defendants are liable under Section 20(a) for the allegedly fraudulent statements made by Avaya, a "controlled person," during the class period.

## C. Heightened Pleading Rules

"[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs*, 127 S. Ct. at 2509. As is also true generally, "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* Because this is a securities fraud case, however, we do not merely ask, as we normally would under Rule 12(b)(6), "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation marks omitted) (applying standard set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). Instead, Shareholders must satisfy the heightened pleading rules codified in the PSLRA.

The PSLRA provides two distinct pleading requirements, both of which must be met in order for a complaint to survive a motion to dismiss. First, under 15 U.S.C. § 78u-4(b)(1), the

21

complaint must "specify each allegedly misleading statement,[17] why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust*, 503 F.3d at 326 (footnote added) (construing 15 U.S.C. § 78u-4(b)(1)). Second, the complaint must, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Significantly, both provisions require facts to be pleaded "with particularity." As we have explained, "[t]his ['particularity'] language echoes precisely Fed. R. Civ. P. 9(b)." *Advanta*, 180 F.3d at 534; *see* Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."). Indeed, although the PSLRA replaced Rule 9(b) as the pleading standard governing private securities class actions, *see Tellabs*, 127 S. Ct. at 2507–08, Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by the requirements of [§ 78u-4(b)(1) of] the PSLRA." *Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 85 n.5 (1st Cir. 2008); *see Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1165 (9th Cir. 2009) ("[T]he

--------

[17]Here, the District Court found Shareholders adequately identified defendants' allegedly misleading statements with the requisite particularity. *Charatz*, 2006 WL 2806229, at *9. Defendants do not dispute this finding on appeal.

22

inquiry into whether plaintiffs have pled falsity with the requisite particularity under the PSLRA is nearly identical to that under Federal Rule of Civil Procedure 9(b) . . . ."); *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 550 (5th Cir. 2007) (Section 78u-4(b)(1) "appears to comport with this Court's relatively strict interpretation of Rule 9(b), which requires a plaintiff to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." (internal quotation marks omitted)). This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." *Advanta*, 180 F.3d at 534 (internal quotation marks omitted). Section 78u-4(b)(1) adds an additional requirement where "an allegation regarding [a defendant's] statement or omission is made on information and belief." 15 U.S.C. § 78u-4(b)(1). In those circumstances, plaintiffs must also "state with particularity all facts on which that belief is formed." *Id.*; *see ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002). That is, when allegations are made on information and belief, the complaint must not only state the allegations with factual particularity, but must also describe the sources of information with particularity, providing the who, what, when, where and how of the sources, as well as the who, what, when, where and how of the information those sources convey.

The PSLRA's requirement for pleading scienter, on the

23

other hand, marks a sharp break with Rule 9(b). Under § 78u-4(b)(2), "a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Rule 9(b)." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008); *see* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). Instead, under the PSLRA's "[e]xacting" pleading standard for scienter, "any private securities complaint alleging that the defendant made a false or misleading statement must . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs*, 127 S. Ct. at 2504, 2508 (internal quotation marks omitted).

## D. Safe Harbor

Plaintiffs must satisfy these pleading requirements whether the alleged fraudulent statement at issue is an assertion of current fact or a prediction of the future. The PSLRA imposes additional burdens, however, with respect to allegations involving predictions. The Safe Harbor provision, 15 U.S.C. § 78u-5(c), immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood.[18] The District Court

---

[18]The Safe Harbor provides:

> [A] person . . . shall not be liable with respect to any forward-looking statement, whether written or

24

found that many of the allegedly misleading statements identified in the Complaint were protected by the Safe Harbor provision. *Charatz*, 2006 WL 2806229, at \*18–19. It concluded that defendants' statements were "forward-looking predictions of future economic performance" indicating "management's plans and objectives," *id.* at \*18, and were

oral, if and to the extent that—
    (A) the forward-looking statement is—
        (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
        (ii) immaterial; or
    (B) the plaintiff fails to prove that the forward-looking statement—
        (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or
        (ii) if made by a business entity; was—
            (I) made by or with the approval of an executive officer of that entity; and
            (II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).

25

accompanied by meaningful cautionary language.

## III.

### A. Applicability of the Safe Harbor

Shareholders contend the District Court erred in applying the Safe Harbor to immunize certain statements. First, they argue the court improperly held the "on track" statements were forward-looking. Second, as for the other forecast-related statements, they contend the Safe Harbor should not be applied on the pleadings because jurors could reasonably disagree over the meaningfulness of Avaya's cautionary language. Shareholders argue Avaya's cautionary statements were "diluted" by the later "assurances" that it was "on track" to meet its projections and was not impairing profits with price concessions. Finally, Shareholders contend the Safe Harbor does not apply here because they have sufficiently alleged defendants had actual knowledge of the false or misleading nature of the forecast-related statements.

On January 25, 2005, defendants announced Avaya's financial and operational results for Q1 FY2005. Notably, defendants stated: "Our first quarter results position us to meet our goals for the year"; and "we are on track to meet our goals for the year, even though there were some aspects to our performance that are below our expectations and that we are

26

working on to improve."[19]  Defendants assert that these statements are forward-looking because their accuracy can only be discerned at a future date.  Furthermore, they contend these statements are inactionable puffery and that, in any case, "a statement that a company is 'on track'—even if to meet a specific goal—is simply too vague and general to be actionable."  Defendants' Br. 37.  Shareholders contend these "on track" recitals are positive statements of current fact and, accordingly, are not forward-looking.

The term "forward-looking statement" is broadly defined in the statute to include statements "containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; statements of "the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; or statements of "future economic performance, including any such statement contained in a discussion and analysis of

---

[19]*See also* Statement of Don Peterson, CEO, Q1 2005 Avaya Earnings Conference Call, Jan. 25, 2005 ("I would just . . . take a moment and reiterate again what we have said we plan to do for the year.  Growing revenue 25 to 27 percent.  Increasing operating income by 40 percent.  Increasing our annualized margin to the 8.5 to 9 percent range, which would put us on the trajectory to go beyond that in 2006.  All those things are on track.").

financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission." 15 U.S.C. § 78u-5(i)(1)(A)–(C). Further, forward-looking statements include "any statement of the assumptions underlying or relating to any statement described" in the definition. § 78u-5(i)(1)(D).

"[A] mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Tellabs II*, 513 F.3d at 705; *accord In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005) ("The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement."). In *Tellabs II*, defendants stated that sales of their product were "still going strong." 513 F.3d at 705. The Seventh Circuit interpreted the communication as "saying both that current sales were strong and that they would continue to be so, at least for a time, since the statement would be misleading if Tellabs knew that its sales were about to collapse." *Id.* Accordingly, defendants were not entitled to "a safe harbor with regard to the statement's representation concerning current sales." *Id.* In *Stone & Webster*, defendants had asserted that the company "has on hand and has access to sufficient sources of funds to meet its anticipated . . . needs." 414 F.3d at 207. Even though "the statement includes a reference to anticipated future needs for funds," the First Circuit found a portion of defendants' assertion

28

to be a statement of present fact ineligible for the Safe Harbor provision. *Id.* at 212. "[T]he alleged falsehood was in the fact that the statement claimed that the Company had access to ample cash at a time when the Company was suffering a dire cash shortage. The claim was not that the Company was understating its future cash needs." *Id.* at 213.

Unlike the language in *Tellabs II* and *Stone & Webster*, the "on track" and "position us" portions of the January 25, 2005 statements, when read in context, cannot meaningfully be distinguished from the future projection of which they are a part. Shareholders argue that these phrases make claims of current fact. Here, however, the assertions of current fact are too vague to be actionable. These statements do not justify the financial projections in terms of any particular aspect of the company's current situation; they say only that, whatever that situation is, it makes the future projection attainable. Such an assertion is necessarily implicit in every future projection. At issue in *Tellabs II*, by contrast, was a specific assertion about the current state of sales that could be distinguished from the future projections: it could be true, for example, both that current sales are weak, and that future sales will be strong.

Similarly, defendants in *Stone & Webster* made a claim about the company's current level of funding. Insofar as that present situation was related to future projections, the *Stone & Webster* language bears a superficial resemblance to the language here. But the claim in *Stone & Webster* was not merely that the company would hit a certain target in the future,

29

but rather that the company had, at the present moment, enough funding to meet anticipated future liabilities. As the First Circuit explained, the question was not whether "the Company was understating its future cash needs," but whether it "had access to ample cash" at the time the statement was made. *Id.* The "on track" and "position us" language here, however, does not advert to a particular current fact such as cash on hand, but expresses only defendants' continuing comfort with the earlier, October annual projection, which they were then reiterating; that is, it amounts in essence to a reaffirmation of that projection.[20] It does not transform the statements, or any part of them, into non-forward-looking assertions outside of the Safe Harbor.[21]

Shareholders also contend that their allegations based on defendants' forward-looking statements throughout the class period were improperly dismissed because reasonable jurors could disagree on the meaningfulness of the cautionary language associated with the forecasts. Specifically, Shareholders assert that defendants "diluted" cautionary language associated with the forecasts by later assuring investors that Avaya was "on track" to meet projections, by increasing the revenue growth

---

[20]*See also infra* note 48.

[21]Even if parts of the January statements do not enjoy Safe Harbor protection, Shareholders have not adequately pled either the falsity of the statements, or defendants' scienter. *See infra* Section III.B–C.

forecast in March, and by indicating that Avaya was not offering unusual and increased discounts.

Forward-looking statements are protected under § 78u-5(c) if they are identified as forward-looking[22] and are "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i). "Cautionary language must be 'extensive and specific.'" *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004) (quoting *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000)). "[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Id.* (quoting *Semerenko*, 223 F.3d at 182).[23]

---

[22]Defendants noted in each of their conference calls, press releases, and presentations that forward-looking statements were contained therein. Shareholders do not contest this point.

[23]Shareholders suggest the very fact that Avaya's share price dropped precipitously upon the announcement of its Q2 results is proof that the cautionary language provided insufficient warning. But the case on which Shareholders rely, *Asher v.*

31

Defendants' cautionary language here was extensive and specific. Avaya's SEC filings contain a detailed list of specific factors and uncertainties that could affect its future economic performance. *See, e.g.*, Avaya Inc., Quarterly Report for the Period Ended December 31, 2004 (Form 10-Q), at 44–45 (Feb. 8, 2005). These documents explicitly warned that Avaya's forward-looking statements "*may turn out to be wrong*" because "[t]hey can be affected by inaccurate assumptions we might make or by known or unknown risks and uncertainties." *Id.* at 44. Avaya included in a list of these "risks and uncertainties" the very "price and product competition" Shareholders assert was responsible for Avaya's missing its projections. *Id.*; *see*

*Baxter International Inc.*, 377 F.3d 727 (7th Cir. 2004), rejected that argument. The *Asher* court acknowledged the intuitive appeal of Shareholders' position, noting that "one can complain that the cautionary statement must have been inadequate" whenever "the firm's disclosures (including the accompanying cautionary statements) are false or misleadingly incomplete." *Id.* at 729. But such a view would divest the Safe Harbor of any function, since there is no potential liability—and thus no need for Safe Harbor protection—where there is nothing false or misleading about a firm's statements. In other words, if the Safe Harbor were automatically inapplicable whenever a firm's disclosures actually misled investors, then the Safe Harbor would be superfluous. "Yet it would be unsound to read the statute so that the safe harbor never works; then one might as well treat . . . § 78u-5 as defunct." *Id.*

32

*also id.* at 47–48 ("We face intense competition from our current competitors and . . . may face increased competition from companies that do not currently complete [sic] directly against us. . . . Competitors with greater resources also may be able to offer lower prices . . . ."). Avaya also warned about uncertainties related to its marketing strategy, stating that "if we do not successfully execute our strategy to expand our sales in market segments with higher growth rates, our revenue and operating results may continue to be adversely affected." *Id.* at 46. In each conference call[24] and press release,[25] defendants also

---

[24]For example, Avaya's Vice President of Investor Relations, Matt Booher, began the January 25, 2005 conference call with analysts with the following admonition:

> These remarks may contain forward-looking statements regarding the Company's outlook. This outlook is based on current expectations, forecasts and assumptions that involve risks and uncertainties that could cause actual outcomes and results to differ. Additional information regarding these risks and uncertainties may be found in our filings with the Securities and Exchange Commission and in particular our fiscal 2004 Form 10-K and in our 10-Q filings.

[25]For example, Avaya's January 25, 2005 Press Release stated:

> This news release contains forward-looking

33

statements regarding the company's outlook for operating results based on current expectations, forecasts and assumptions that involve risks and uncertainties that could cause actual outcomes and results to differ materially. These risks and uncertainties include, but are not limited to, general industry market conditions and growth rates and general domestic and international economic conditions including interest rate and currency exchange rate fluctuations and the economic, political, and other risks associated with international sales and operations, U.S. and foreign government regulation, *price and product competition* [emphasis added], rapid technological development, dependence on new product development, the successful introduction of new products, the mix of our products and services, customer demand for our products and services, the ability to successfully integrate acquired companies, control of costs and expenses, the ability to implement in a timely manner our restructuring plans, and the ability to form and implement alliances.

For a further list and description of such risks and uncertainties, see the reports filed by Avaya with the Securities and Exchange

34

explained that the forward-looking statements involved risks and uncertainties that could cause actual outcomes and results to differ materially from projections and specifically directed readers to Avaya's SEC filings. We agree with the District Court's assessment that "[t]hese cautionary statements are not vague or blanket disclaimers, but instead are substantive, extensive, and tailored to the future-looking statements they reference." *Charatz*, 2006 WL 2806229, at \*19.

Shareholders assert defendants' "on track" statements, March forecast increase, and assurances regarding price stability "diluted" the impact and meaningfulness of the cautionary language. Shareholders rely on *EP MedSystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865 (3d Cir. 2000), suggesting that "repeat assurances may preclude invocation of the safe harbor defense as a matter of law, because reasonable jurors could differ about whether the warning was meaningful." Shareholders' Br. 46. But *EP MedSystems* is distinguishable. In *EP MedSystems*, plaintiffs brought a Section 10(b) suit alleging EchoCath enticed them into investing $1.4 million by assuring them that contracts with four prominent companies to market EchoCath products were imminent. *Id.* at 867. Several of EchoCath's Annual and Quarterly reports cautioned investors that there could be no assurance that the company would ever successfully commercialize any of its products or complete any of the expected license agreements or strategic alliances on

Commission.

acceptable terms. *Id.* at 877. But when negotiating with EP MedSystems, EchoCath's CEO made repeated assurances that license agreements with four companies were imminent. *Id.* at 876–77. These representations were not accompanied by any cautionary language. *Id.* at 877. We concluded that whether the cautionary language found elsewhere was "sufficient to neutralize" EchoCath's initial representations and repeated assurances could not be decided as a matter of law. *Id.* In contrast to the statements made by EchoCath, Avaya's alleged assurances were, as noted, accompanied by cautionary language.[26] Accordingly, the cautionary language issue was

---

[26]*EP MedSystems* may be distinguishable for another reason. The court acknowledged that the case "is more akin to a contract action than a securities action":

> [T]here are important distinctions between this case and the usual securities actions for which these principles were developed. Although EchoCath . . . sought to sell its securities in the market . . . MedSystems does not base its claim on public misrepresentations or omissions that affected the price of the stock it purchased. Instead, it contends that it was induced to make the substantial $1.4 million investment as a result of personal representations directly made to its executives by EchoCath's executives and that those representations were false and misleading.

*Id.* at 871.

36

properly decided as a matter of law.[27]

Finally, Shareholders contend that the Safe Harbor provision does not apply because they have sufficiently alleged defendants had actual knowledge of the falsehood of the forecast-related statements. The parties dispute whether statements made with actual knowledge of falsity can nonetheless be immunized by cautionary language under the Safe Harbor. Defendants note the Safe Harbor is written disjunctively and thus argue that the cautionary-language prong provides a separate, independent "inlet" of protection even where plaintiffs can show (or, for purposes of Rule 12(b)(6), adequately allege) defendants' knowledge of a statement's falsity. Shareholders, by contrast, contend that cautionary

---

[27]Shareholders also cite *Asher v. Baxter International Inc.*, 377 F.3d 727 (7th Cir. 2004), for support. *Asher* is distinguishable. In *Asher*, the plaintiffs contended defendant's cautionary language was not meaningful because it did not identify the major risks Baxter International faced during the relevant period. *Id.* at 734. In contrast, the major risks that allegedly were realized here—failure of the GTM strategy, intense competition, and pricing pressure—were identified and disclosed by Avaya throughout the relevant period.

We also reject any implication that the mere repetition of the projections by defendants somehow "serve[d] to neutralize the cautions." Shareholders' Br. 46. Each statement was accompanied by the appropriate cautionary language.

language cannot be "meaningful," *see* 15 U.S.C. § 78u-5(c)(1)(A)(i), when it identifies possible risks that defendants know have already eventuated. *Compare In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1165–67 (C.D. Cal. 2003) (supporting Shareholders' position),[28] *with Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003) (supporting defendants' position), *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 371–72 (5th Cir. 2004) (same), *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 201 (1st Cir. 1999) (same), *and Harris v. Ivax Corp.*, 182 F.3d 799, 803–04 (11th Cir. 1999) (same).

Shareholders do not deny, however, that defendants' forward-looking statements come within the Safe Harbor as long as the Complaint's allegations fail to give rise to a strong inference that defendants actually knew of the statements' falsity. *See* 15 U.S.C. § 78u-5(c)(1). This point is dispositive here, since we conclude below, *see infra* Section III.C, that Shareholders have not sufficiently pleaded a strong inference that defendants acted with actual knowledge that their

---

[28]Shareholders also seek support from our opinion in *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999). Because there was no cautionary language to consider in that case, however, we did not address whether cautionary language could immunize a statement made with actual knowledge of its falsity.

projections were false or misleading.[29]  This scienter conclusion provides a ground for dismissing Shareholders' claims relating to the forward-looking statements, one that would apply even assuming defendants' cautionary language was inadequate.

## B.  Falsity

Under Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b)–(c).  The first requirement under the PSLRA obliges a plaintiff to specify each allegedly misleading statement, the reason or reasons why the statement is misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity.  15 U.S.C. § 78u-4(b)(1);[30] *Tellabs*, 127 S. Ct. at 2508; *Winer*

_____

[29]As explained below, this is a more demanding standard of scienter than applies to statements of current fact.

[30]Section 78u-4(b)(1) states, in its entirety:
    (1) Misleading statements and omissions
    In any private action arising under this chapter in which the plaintiff alleges that the defendant—
        (A) made an untrue statement of a material fact; or
        (B)  omitted  to  state  a  material  fact

*Family Trust*, 503 F.3d at 326. Defendants contend Shareholders' allegations are insufficient because they fail to demonstrate with sufficient particularity that defendants' statements were false or misleading when made—i.e., "the reason or reasons why the statement[s are] misleading."

## 1. Pricing-Pressure Statements

First, defendants challenge the sufficiency of the Shareholders' pricing-pressure allegations. As noted, Peterson and McGuire repeatedly assured analysts and investors that, although there was pressure in the market, there were no significant changes to the pricing environment. Shareholders challenge several of defendants' statements denying the existence of significant pricing pressure from competitors, contending that defendants knew of or recklessly disregarded the fact that competition was forcing 20% to 40% price discounts that impaired profit margins. Shareholders attempt to

> necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

show falsity by alleging various sources for the "true facts" known or recklessly disregarded by defendants.

Defendants contend the CW statements and Lehman Brothers report provide, at most, anecdotal evidence of discounts. They note that the CWs and the Lehman Brothers analysts only had access to information on a product level and did not have access to national data. Furthermore, defendants assert that the discounts were not unusual during the class period compared to prior years.[31] Defendants assert any price

---

[31]As evidence, defendants compare the gross margin percentage during the class period (46%) to the same period during the prior fiscal year (46%). *See supra* note 6 (defining gross margin percentage). Although the gross margin percentage did not differ from the same period in the previous year, many different factors in addition to discounting can affect this figure. For example, Avaya's second quarter 10-Q report indicated several factors affecting its gross margin percentage: increased volume, cost reduction initiatives, product mix, and the acquisition of Tenovis. Avaya Inc., Quarterly Report for the Period Ended March 31, 2005 (Form 10-Q), at 32 (May 10, 2005). Because the gross margin percentage is not conclusive as to the existence of unusual discounting, defendants' reliance on similar gross margin percentage numbers to "demonstrat[e] that any supposed price concessions were in line with prior practice," Defendants' Br. 34, is misplaced.

Insofar as Avaya's gross margin percentage and other

concessions were in line with prior practice.

Shareholders' allegations primarily rely on the representations of confidential witnesses. As noted, CW3 is a confidential witness and former Global Contract Manager who worked at Avaya until November 2004. CW3 worked on the top forty accounts in the United States. According to CW3, Avaya's business model had "essentially broken down" prior to his departure. Due to Avaya's "inability to compete" with Cisco

---

reported financial results are in tension with the reports of the CWs and analysts, a jury could decide to discredit the latter. But in reviewing a district court's dismissal under Rule 12(b)(6), we do not resolve factual disputes—even in cases governed by the PSLRA. Rather, we "must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs*, 127 S. Ct. at 2509; *see Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 551 (5th Cir. 2007) ("[T]he strong-inference pleading standard does not license us to resolve disputed facts at this stage of the case." (internal quotation marks omitted)). We then test these allegations to see whether they are adequately particularized and whether they satisfy the pleading requirements for falsity and scienter. When we consider allegations of scienter under 15 U.S.C. § 78u-4(b)(2), *Tellabs* instructs us to consider competing *inferences* from the allegations, but we nonetheless assume the truth of the specific facts alleged. *See Integrated Elec. Servs.*, 497 F.3d at 551.

and AT&T Solutions, numerous large clients, such as Merrill Lynch and Citigroup, were able to pressure Avaya into large price concessions. For example, Citigroup allegedly forced Avaya to accept a 20% price reduction with no change in services because Avaya feared losing Citigroup to AT&T Solutions's "outsourcing" product.

CW4 is a former Avaya employee who was employed throughout the class period and was responsible for evaluating the profitability of special bids in the Services organization. According to CW4, Avaya was facing substantial pricing pressure[32] and was forced to give substantial discounts to win business throughout the class period. "In many instances Avaya was granting price concessions in excess of 30%–40% in order to win business." Several of Avaya's largest customers—American Express, Hilton Hotels, Dell and Wynn Resorts—received discounts in 2004 and 2005. Furthermore, CW4 stated that, historically, Avaya gave 20% discounts to 20% of its special bid customers. But between January and May 2005, at the request of the sales force, Avaya management gave 20% discounts to 80% of its special bid customers.

CW6, an independent Avaya sales manager who sold Avaya product but was not employed by the company, noted

---

[32]For example, several companies specifically targeted Avaya customers. According to CW4, in October 2004, Avaya learned of United Assets Coverage's tactic to target Avaya customers.

43

that, in March 2005, Avaya was cutting prices on some of its mid-range systems. According to CW6, "Cisco was attacking Avaya on price and hurting Avaya in the small and midsized business markets."

In a case decided before *Tellabs*, we stated:

> [W]here plaintiffs rely on confidential personal sources but also on other facts, they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false. Moreover, even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 146 (3d Cir. 2004) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)). In other words, "a complaint can meet the pleading requirement [of the PSLRA] by providing sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs." *Id.* at 147. We consider the "detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and

similar indicia." *Id.* Where, as here, plaintiffs lack documentary evidence such as internal memoranda, "reliance on confidential sources to supply the requisite particularity for their fraud claims . . . assumes a heightened importance." *Id.* at 148.

We must determine whether this jurisprudence remains good law after *Tellabs*. As one court of appeals has observed, "*Tellabs* did not [specifically] address . . . how courts should go about evaluating allegations based on statements made by unidentified, confidential witnesses." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1239 (11th Cir. 2008). Nonetheless, several of our sister circuits have considered where anonymous witnesses stand in the wake of the Supreme Court's decision. An early Seventh Circuit opinion concluded that *Tellabs* required it to "discount allegations that the complaint [at bar] attributes to five 'confidential witnesses.'" *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). "*Tellabs* requires judges to weigh the strength of plaintiffs' favored inference in comparison to other possible inferences," but in *Higginbotham*'s view, "anonymity frustrates that process" because it "conceals information that is essential to th[is] sort of comparative evaluation." *Id.* at 757. The *Higginbotham* court nonetheless acknowledged that anonymous sources can sometimes "corroborate or disambiguate" other evidence, and that the precise weight to be given to confidential witness allegations can be determined only in the context of all the other allegations presented in a specific case. *Id.* For these reasons, the court concluded that information alleged by confidential

45

sources "must be 'discounted' rather than ignored." *Id.* But it emphasized that "[u]sually that discount will be steep." *Id.*

Other courts, however, have qualified *Higginbotham*'s strong skepticism of confidential sources. The Seventh Circuit itself distinguished *Higginbotham* in *Tellabs II*. As the latter case observed, not only were the sources in the *Higginbotham* complaint anonymous, but they were also "described merely as three ex-employees of [the defendant company] and two consultants." *Tellabs II*, 513 F.3d at 712. The confidential sources listed in the *Tellabs II* complaint, on the other hand, "are numerous and consist of persons who from the description of their jobs were in a position to know at first hand the facts to which they are prepared to testify . . . . The information that the confidential informants are reported to have obtained is set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources." *Id.* The *Tellabs II* court conceded that, all else being equal, a complaint with named sources "would be better" than one with confidential witnesses, but "the absence of proper names does not invalidate the drawing of a strong inference from informants' assertions." *Id.* *Tellabs II* apparently circumscribes *Higginbotham*'s broad pronouncement that confidential witness allegations will "usually" be steeply discounted, clarifying that the weight accorded to anonymous sources will depend in large part on the level of detail with which they are described. In *Tellabs II*, then, the Seventh Circuit appears to have reached essentially the same conclusion we set forth earlier in *Chubb*. *Tellabs II* cites that

46

case approvingly. *See id.*

Other circuits have staked out similar positions. *See, e.g.*, *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) (evaluating "whether a complaint has provided sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge"); *Mizzaro*, 544 F.3d at 1240 (Although there are "reasons why courts may be skeptical of confidential sources cited in securities fraud complaints . . . [,] [c]onfidentiality . . . should not eviscerate the weight given [to these sources] if the complaint otherwise fully describes the foundation or basis of the confidential witness's knowledge, including the position(s) held, the proximity to the offending conduct, and the relevant time frame."); *see also Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008) (endorsing *Higginbotham*'s steep discount where plaintiffs not only withheld the names of employees who knew of defendant's "alleged accounting improprieties," but also failed to allege "what, when, where, and how" the employees knew of that information).

In our view, the case law interpreting the Supreme Court's *Tellabs* opinion confirms the position we took in *Chubb*. The PSLRA imposes a particularity requirement on all allegations, whether they are offered in support of a statement's falsity or of a defendant's scienter. 15 U.S.C. § 78u-4(b)(1), (b)(2). In the case of confidential witness allegations, we apply that requirement by evaluating the "detail provided by the

47

confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Chubb*, 394 F.3d at 147. If anonymous source allegations are found wanting with respect to these criteria, then we must discount them steeply. This is consistent with *Tellabs*'s teaching that "omissions and ambiguities count against inferring scienter" under the PSLRA's particularity requirements. *Tellabs*, 127 S. Ct. at 2511. If, on the other hand, a complaint's confidential witness allegations are adequately particularized, we will not dismiss them simply on account of their anonymity.[33] In short,

---

[33]Of course, confidential witness allegations may score highly on the *Chubb* test yet fail either to establish the falsity of a statement, or to give rise to a strong inference of scienter. Nonetheless, for analytical purposes, it is important to distinguish deficiencies relating to the content of allegations from those relating to their form. The *Chubb* test addresses only the latter issue. *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1069 n.13 (9th Cir. 2008) (The confidential witnesses' "identity and knowledge . . . are described with sufficient specificity to meet the PSLRA's standards generally. The problem for [plaintiff] is not that the confidential witnesses are inadequately identified—the problem is that these witnesses do not convey information sufficient to support the strong inference of scienter that the PSLRA requires." (internal citation omitted)).

48

*Chubb* remains good law.

Referring to the *Chubb* factors, the District Court here concluded that "[p]laintiffs have appropriately described the positions formerly held by each of [the confidential] sources as well as the basis of the sources' personal knowledge." *Charatz*, 2006 WL 2806229, at *10. We agree. Shareholders have adequately described the duration of each CW's employment, the time period during which the CWs acquired the relevant information, and how each CW had access to such information. *See Chubb*, 394 F.3d at 150.

In addition to the CW statements, Shareholders cite the March 2005 Lehman Brothers report, which was based upon discussions with Avaya resellers. The report indicated that Avaya offered "aggressive" and "unusually attractive" 30% to 40% discounts on its mid-range products (150–400 lines) beginning in March 2005.[34] Lehman Brothers estimated that sales of the mid-range systems "constitute a significant portion of the enterprise telephony industry sales" and warned that if the promotion were highly successful, "Avaya's product margins would be somewhat impacted." According to Shareholders, this report corroborates CW3's, CW4's, and CW6's allegations and directly contradicts McGuire's assurances that pricing remained

---

[34]The report stated: "According to some resellers, the aggressive 30–40% discount Avaya has been offering on its mid-range (150–400 lines) systems since the beginning of March is quite unusual."

49

normal.

Furthermore, Shareholders allege that after denying the existence of unusual discounting and pricing pressure, McGuire admitted that Avaya was in fact providing discounts. On April 19, 2005,[35] in response to questions about discounting, McGuire stated: "There is no new specific discounting policy we put in place. I can tell you that our discounts were relatively black or improved in most parts of the world, except for international direct where they were up slightly." On April 28, 2005, McGuire was asked about "some reports published recently saying that Avaya gave a 30% to 40% discount in the first quarter." As noted, McGuire responded: "Now, I hear the noise that, yes, we were out with a 30% to 40% discount on a program in last quarter.[36] . . . [I]t's not unusual . . . . And quite frankly,

---

[35]As noted, Q2 FY2005 ended on March 31, 2005.

[36]Shareholders interpret "last quarter" to mean Q1 FY2005 (October 2004 to December 2004). Defendants disagree, contending that since the statement was made in Q3 FY2005, McGuire was referring to the discount reported by Lehman Brothers in Q2 FY2005. Because the quarter referred to by McGuire remains unclear, we will assume for purposes of this appeal that Shareholders' interpretation is correct. *See supra* note 31; *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (accepting "all factual allegations as true" and construing "the complaint in the light most favorable to the

a 30% to 40% discount is not out of the norm for any of these programs."

The CW statements allege a series of unusual and substantial discounts across several business lines—both sales of products and services. The Complaint alleges that Avaya provided significant and unusual discounts to some of its biggest customers in order to retain their business. Furthermore, the Complaint lists several of the large customers awarded discounts. The Lehman Brothers report and McGuire's April 28, 2005 statement reinforce the CWs' account that a 30% to 40% discount was in place on the mid-range products. Furthermore, the Lehman Brothers report, based on conversations with resellers, characterized the discount as "quite unusual" and "aggressive."

In *Chubb*, plaintiffs alleged that defendants issued false or misleading statements representing that a rate initiative was ameliorating the problems in their business and was doing so more quickly than anticipated. To substantiate these allegations, plaintiffs proffered confidential witness statements identifying specific customers that Chubb lost as a result of their rate initiative. Nonetheless, we concluded that the "anecdotal examples of profitable customers lost or policies renewed at flat or slightly raised rates does not demonstrate that the rate initiative was failing, especially in light of defendants' Class Period disclosures." *Id.* at 156. But here, the CW statements

plaintiff" (internal quotation marks omitted)).

51

identifying deep and unusual discounting, although anecdotal, represent the range of Avaya's U.S. businesses—including both products and services. Furthermore, the statements directly conflict with McGuire's repeated assurances throughout the class period that pricing remained "fairly steady." Accordingly, Shareholders have pled unusual price discounting with the particularity required by the PSLRA. While we find that Shareholders have sufficiently pled falsity with respect to all of the discounting statements, it is worth noting that the allegations of discounting are significantly stronger—that is, broader, more detailed, and more interlocking—for Q2 (January to March 2005) than for Q1 (October to December 2004).

## 2. Forecast-Related Statements

Shareholders also challenge defendants' revenue and operating margin growth forecasts made throughout the class period, alleging that defendants' January 2005 "on track" statements were materially false or misleading because Avaya was not "on track" and had no basis for claiming Avaya would do better in the United States as the year progressed. They assert that "defendants knew at the time of making their statements that Avaya was experiencing substantial disruption in its sales channels as a result of the [GTM] program."[37] On

[37]According to a former Avaya Director of Operations, Global Solutions Sales and Support and a former Avaya Senior Client Executive, McGuire established financial projections on a "top down" basis; he did not solicit any input from the sales

several occasions during FY2005, defendants represented they were "on track" to meet their projected goals. Furthermore, in March 2005, approximately a month and a half before the April 19, 2005 announcement, McGuire expressed confidence in the forecast.

Defendants contend Shareholders' reliance on the CWs in the Complaint is insufficient to meet the particularity requirements of the PSLRA because none of the CWs worked in positions which would provide them with insight or visibility into Avaya's corporate-wide forecasts. According to defendants, Shareholders point to relatively low-level former employees (or non-employees)—none of the CWs are officers, none worked at headquarters, and none claimed to participate in the forecasting process.[38] Defendants assert that, at most, the CWs' statements consist of random anecdotes that, when juxtaposed against defendants' statements, do not meet the

representatives. Shareholders allege that "McGuire's quotas were based upon the unreasonable financial projections McGuire made to investors, as opposed to reasonable assessments as to what was realistically attainable."

[38]As stated above, CW3 was a Global Contract Manager, CW4 evaluated the profitability of special bids in the Services organization, CW5 was a Senior Client Executive who left the company in March 2004, and CW6 was an independent sales manager who was not employed by the company.

standard for pleading falsity.

As noted, in October 2004, Avaya set its operating margin goal for FY2005 between 8.5% and 9% and its expected revenue growth rate between 25% and 27%. At the end of the first quarter, defendants said "we are on track to meet our goals for the year, even though there were some aspects of our performance that are below our expectations and that we are working on to improve." During a January conference call with analysts, Peterson reiterated the October 2004 forecast and explained that even though Avaya's business is "somewhat . . . seasonal" and that U.S. product sales were "not up to our expectations," "we think that we had a solid quarter that is positioning us well to go on through the rest of the year and achieve those goals."

On March 2, 2005, McGuire adjusted Avaya's projected revenue growth to 28%,[39] expressed comfort with the October 2004 forecast, and noted that "we are building on the momentum that we've got in the market relative to the technology lead, our applications, . . . and our global services."

On April 19, 2005, Avaya announced that it would be unable to meet its previously stated goals for growing revenues, operating income, and operating margin in FY2005. Peterson blamed internal problems, especially the GTM strategy, for the missed benchmarks. McGuire claimed that during January and

---

[39]*See supra* note 9.

February 2005, Avaya was "tracking slightly at or just a little bit below the quarter before" and was "track[ing] well for March closure both on the indirect and the direct side." According to McGuire, the internal indicators provided "comfort" that Avaya would remain on track to achieve the year-end goals. But Avaya was caught by "surprise" in the last week of March when distributors did not repurchase at rates consistent with prior practice and when Avaya failed to close several deals.

Shareholders allege various sources and "true facts," in addition to those described above, to show that defendants' forecast-related statements were materially false or misleading. In addition to the facts alleged by CW3 and CW4—Avaya was faced with and succumbed to significant pricing pressure—CW5, a former Senior Client Executive with Avaya from 2001 to March 2004, alleged that it became apparent in October 2003 that Avaya's sales strategy[40] would cause a "substantial loss of business." He noted many customers lost confidence and trust in Avaya when Client Executives were reassigned to mid-market accounts. CW5 averred that he personally lost approximately $7 million in sales, including contracts with ACS in Utica, New York and Alcoa. According to CW5, due to the long sales cycle—between six months and one-and-a-half years—losses experienced in October 2003

---

[40]According to CW5, the GTM strategy began in October 2003. In contrast, defendants state that the GTM strategy was launched in October 2004. *See supra* note 31.

would have a "substantial impact" on Avaya's financial results in FY2005.

Shareholders also assert defendants' March forecasting statements were false or misleading when made. As evidence, Shareholders cite a March 4, 2005 report by members of the Buckingham Research Group who performed a sales channel check. The report concluded that Avaya was experiencing "weak" spending for its products and had fired sales staff in order to cut costs. The analysts predicted Avaya's actions would "negatively effect [sic] growth."

As noted, a plaintiff must explain "how or why" their confidential source would have the knowledge alleged. *Chubb*, 394 F.3d at 149. Shareholders have adequately alleged when their sources were employed by Avaya, when they obtained the information they allegedly possess, and whether their supposed knowledge is first or second hand. *See id.* at 150. Shareholders contend that defendants' forecast-related statements were materially false or misleading at the time they were made based on the collection of information before us.

This information sufficiently pleads the falsity of the March projections, for many of the same reasons it adequately pleaded the falsity of the March pricing statements. If we assume the allegations of significant Q2 discounting are true, it is reasonable to infer that the reaffirmed projections of revenue and margins were, by March, no longer sound (and were thus misleading). The anecdotal allegations, however, are less

56

persuasive with regard to the earlier statements. To begin with, they are both less focused chronologically and less mutually reinforcing than the allegations of Q2 discounts. An even larger stumbling block for plaintiffs, however, is that Avaya exceeded expectations for Q1 FY2005—October 2004 to December 2004.[41] Defendants contend that, at the time of the forecast-related statements (first issued in October and reiterated in January), the projections were possible to achieve. The facts alleged in the Complaint, when viewed against the backdrop of the successful Q1 results, do not belie this conclusion. We therefore agree with defendants that Shareholders have failed to plead with the requisite particularity the allegation that the October and January forecasts were false or misleading when made. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("To be actionable, a statement or omission must have been misleading at the time it was made; liability cannot be imposed on the basis of subsequent events.").

### 3. Falsity Conclusion

Shareholders have adequately specified the reasons why defendants' pricing-pressure statements and March projections were false or misleading when made. In contrast, we find insufficient the allegations that defendants' January and October

---

[41]*See* Compl. ¶ 58 ("Avaya's first quarter results were in line with, or better than, analysts' expectations. For instance, Avaya reported Earnings Per Share ("EPS") of 20 cents, beating consensus estimates of 18 cents.").

forecast-related statements were false or misleading when made.

## C. Scienter

As discussed above, the PSLRA's first pleading requirement is that a plaintiff must "specify each allegedly misleading statement, why the statement was misleading, and, if an allegation is made on information and belief, all facts supporting that belief with particularity." *Winer Family Trust*, 503 F.3d at 326 (construing 15 U.S.C. § 78u-4(b)(1)). As noted, only Shareholders' pricing-pressure and March-projection allegations satisfy this requirement. Under the PSLRA's second pleading requirement, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This scienter standard requires plaintiffs to allege facts giving rise to a "strong inference" of "either reckless[42] or conscious behavior."

---

[42]"A reckless statement is one involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Advanta*, 180 F.3d at 535 (internal quotation marks omitted). "[C]laims essentially grounded on corporate mismanagement" do not adequately plead recklessness. *Id.* at 540 (internal quotation marks omitted).

In *Tellabs*, the Supreme Court continued to reserve judgment on "whether reckless behavior is sufficient for civil

*Advanta*, 180 F.3d at 534–35 (footnote added). Two cases clarifying the PSLRA standard for pleading scienter were decided after the District Court issued its order in this case: *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499 (2007), and *Winer Family Trust v. Queen*, 503 F.3d 319 (3d Cir. 2007).

As interpreted by *Tellabs*, the second requirement of the PSLRA—that the plaintiff plead with particularity facts giving rise to a "strong inference" of scienter—obliges courts to weigh the "plausible nonculpable explanations for the defendant's conduct" against the "inferences favoring the plaintiff." 127 S. Ct. at 2510. A "strong inference" of scienter is one that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 2504–05; *see also id.* at 2510 ("The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." (internal quotation marks omitted)). The pertinent question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 2509; *see also id.* at 2511

---

liability under § 10(b) and Rule 10b-5," but it noted that "[e]very Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly." 127 S. Ct. at 2507 n.3.

("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Omissions and ambiguities "count against inferring scienter." *Id.* at 2511.

The District Court concluded that Shareholders failed to plead scienter sufficiently. Shareholders assert error, contending the District Court did not consider the combination of specific facts from various sources "collectively." They maintain that, when considered collectively, the pleaded facts "meet and exceed" the strong-inference pleading standard. Specifically, they argue that "[t]aken together, plaintiffs' witness reports, analyst and reseller information, and defendants' own admissions, bolstered by the core business inference, the magnitude of the missed forecasts in April 2005, and their temporal proximity to defendants' 'on track' assurances and increased forecast in March 2005, support a strong inference of scienter." Shareholders' Br. 40. Further, they assert their "motive allegations are consistent with scienter, even if," standing alone, they "do[] not establish a strong inference." *Id.* Defendants contend the pleaded facts, including Shareholders' confidential witness accounts, do not show defendants' knowledge (or reckless disregard of the risk) that their statements were false or misleading when made. Furthermore, defendants assert that Shareholders' motive allegations are not indicative of fraud.

## 1. Conscious or Reckless Behavior

60

Peterson and McGuire repeatedly assured analysts and investors that, although there was pressure in the market, there were no significant changes to the pricing environment. Shareholders allege that defendants knew of or recklessly disregarded the fact that competition was forcing unusually large 20% to 40% price discounts that were hurting profit margins. In addition to the CWs' statements, the Lehman Report, and defendants' alleged admissions (described above), Shareholders assert that since competition, pricing policies, and pricing concessions are "core matters" of central importance to Avaya and its principal executives, a "core operations inference" supports scienter. Shareholders contend that "[i]t strains reason to suggest" that Peterson and McGuire did not know about the discounts impairing Avaya's profit margin. Shareholders' Reply Br. 18. Furthermore, Shareholders assert that the magnitude of the missed forecasts in April 2005, and their temporal proximity to defendants' assurances, also support a strong inference of scienter. According to Shareholders, the core operations inference, the magnitude of the miss, and its temporal proximity do not stand alone, but instead "bolster" the "true facts" alleged—the confidential witness reports, the Lehman Brother's report, and McGuire's alleged admissions. In response, defendants contend none of the CWs claimed to have had any connection to or communication with Peterson or McGuire, or knowledge about the information or records to which Peterson or McGuire had access. According to defendants, the CWs offer no factual basis to show that Peterson or McGuire knew, or were reckless regarding the risk that, their statements were false or

61

misleading when made.

*The March Pricing-Pressure Statements*

It is true that Shareholders do not point to any particular document or conversation that would have informed Peterson or McGuire of unusual discounting during the class period. The existence of such a direct link would fortify Shareholders' allegations that defendants' statements about discounting were knowingly or recklessly false. But the Supreme Court has made clear that plaintiffs' allegations of scienter "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre." *Tellabs*, 127 S. Ct. at 2510. Instead, our inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 2509. Accordingly, as with all totality-of-the-circumstances tests, our analysis will be case specific. It will ultimately rest not on the presence or absence of certain types of allegations but on a practical judgment about whether, accepting the whole factual picture painted by the Complaint, it is at least as likely as not that defendants acted with scienter. *See South Ferry LP, #2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("*Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation."); *see also In re Cabletron Sys., Inc.*, 311 F.3d 11, 32 (1st Cir. 2002) ("Each securities fraud complaint must be analyzed on its own facts; there is no one-size-fits-all template.").

We believe the totality of the facts alleged by

Shareholders here establishes a strong inference of scienter with respect to McGuire's March denials of unusual pricing pressure. Contrary to defendants' arguments, Shareholders do not simply allege "fraud by hindsight," that is, they do not claim merely that McGuire's statements turned out to be wrong, and therefore must have been fraudulent. Rather, Shareholders' allegations proffer an array of circumstantial evidence giving rise to a strong inference that McGuire's discounting statements were at least reckless, which is enough to survive a motion to dismiss under the PSLRA.

Among the facts alleged by Shareholders, the most powerful evidence of scienter is the content and context of McGuire's statements themselves. McGuire did not simply make statements inconsistent with the existence of widespread and unusual discounting; he explicitly denied the existence of such discounting in response to repeated questions about pricing by analysts. During a conference call with analysts on March 2, McGuire was asked for his "sense of what the environment is out there right now." McGuire responded that the "[p]ricing environnment is not significantly different. I mean, there are people that will buy a deal from time to time, but in general, the pricing environment has been fairly stable." During another conference call with analysts on March 7, McGuire was asked whether there had been "[a]ny significant changes one way or the other in the pricing environment." McGuire answered, "Perhaps not in the last 12 months. I mean, clearly from time to time people will want to buy a deal here or there, but the market

itself has been fairly stable with just modest declines over the last 12 months." And during a third conference call for analysts just three days later, on March 10, McGuire was queried yet again on pricing: "Now that you say [Cisco] put . . . a decent team in place after losing market share last year, what should we expect in terms of the competitive position that is here in the market? What should we expect in terms of pricing?" McGuire's answer was consistent with his earlier responses: "Pricing has been fairly steady for the last couple of years. I don't anticipate—I don't see any reason that that would change significantly."

It is one thing for a plaintiff to claim that a defendant must have known its earnings projections were false because of the existence of unusual price reductions. Earnings are the bottom-line result of many different components, only one of which is pricing. The mere fact that a defendant made a statement about earnings, therefore, does not necessarily imply he would have been aware of particular pricing developments. But it is another thing when a defendant chief financial officer is specifically asked, directly and repeatedly, whether the company's pricing has held steady despite the competitiveness of the market. Although McGuire acknowledged that Avaya inhabited a competitive industry and offered discounts to some customers on some products and services, Shareholders' central allegation is that Avaya engaged in massive discounting on an unusually large scale during the class period, and this McGuire flatly denied in statements evincing certitude.

64

We do not suggest that the specific nature of the analysts' inquiries, by itself, creates a strong inference of a culpable state of mind. But the focused questions do mark an important distinction between this case and those in which defendants win dismissal on a showing that defendants were most likely simply ignorant of the facts that made their statements false. *See, e.g.*, *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008) ("[C]orporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegation of specific information conveyed to management and related to the fraud."); *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 62–63 (1st Cir. 2008) ("The plaintiffs have not included details about . . . whether this information [allegedly belying defendants' statements] was known to the defendants at the relevant time."). Because of the context (specific analyst queries) and content (consistent denials of unusual discounting) of McGuire's statements, the possibility that McGuire was ignorant is not necessarily exculpatory. Even if McGuire were not aware of the full extent of the unusual discounting, or the entirety of the other circumstances alleged by Shareholders, he might be culpable as long as what he knew made obvious the risk that his confident, unhedged denials of unusual discounting would mislead investors.[43] *See Advanta*,

_____

[43]Of course, if McGuire simply had no idea whether there was unusual discounting, and nonetheless confidently denied its existence, this would also have presented an obvious risk of

65

180 F.3d at 535 (explaining that allowing recklessness to serve as a sufficient basis for liability "promotes the policy objective[] of discouraging deliberate ignorance"); *Tellabs II*, 513 F.3d at 704 ("When the facts known to a person place him on notice of a risk, he cannot ignore the facts and plead ignorance of the risk."). Given the specificity and repetition of the analysts' questions, McGuire's position as Chief Financial Officer, and the alleged state of Avaya's business at the time the questions were asked, there is a strong inference that McGuire's behavior reached this threshold of recklessness.

If the alleged discounting were minor or restricted to only a few products or customers, we would be reluctant to infer that McGuire's denials were culpable. In those circumstances, nonculpable ignorance might be the more likely explanation. But as we have discussed, Shareholders' CWs allege widespread discounting involving many different product lines and accounts, including some of Avaya's largest clients. Allegations that the discounting was of a substantial magnitude are supported by analyst reports and by Avaya's disappointing Q2 results. Avaya's Q2 operating margins were particularly weak—4.3%, about 50% lower than the 8.5% to 9% margins predicted for the year, and 44% lower than the first quarter's

---

misleading investors.

operating margin of 7.7%.[44]  That Avaya's second quarter margins were significantly contracting itself lends support to the inference of scienter.  Throughout the class period, one of investors' and analysts' central questions about Avaya was whether it could sustain and expand its margins in the face of a very competitive market.  In fact, Avaya's operating margin was viewed as so important to the health of the company (and its attractiveness to investors) that its supposed ability to hold and grow this margin was described as the "Avaya story."  The perceived importance of margins supports an inference that McGuire, Avaya's Chief Financial Officer, was paying close attention to these numbers.  *Cf. Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342 (5th Cir. 2008) ("[T]here can be a number of special circumstances which, taken together with an officer's position, may support a strong inference of scienter."

---

[44]Defendants attempt to minimize the significance of the Q2 results, emphasizing that the financial projections at issue concerned expected results for the entirety of the 2005 fiscal year, not for individual quarters.  Defendants' Br. 42–43.  This point would be relevant if it suggested that Q2 results, while less impressive than the Q1 figures, were nonetheless satisfactory and consistent with the annual projections.  Not only, however, did the April figures disappoint the market and analysts, but these results also prompted Avaya itself to announce that its previous annual projections were no longer realizable.  *Id.* at 12–13.  Defendants' insistence that Avaya did not "'miss' the quarter," *see id.* at 43 n.17, is mere wordplay.

67

(internal quotation marks omitted)); *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 211 (1st Cir. 2005) ("The financial strength of the Company was undoubtedly a matter of principal concern to its Chief Executive Officer and Chief Financial Officer."). And because, all else being equal, a change in pricing would directly affect margins, an executive inquiring into a change in margins would be expected to look to pricing for a possible explanation. Accordingly, the steep decline in Avaya's all-important margins in the second quarter of 2005 bolsters the inference that McGuire would have been alerted to the discounting.

Just as the magnitude of the alleged discounting and margin contraction strengthens the inference of scienter, so does the temporal proximity of McGuire's March denials to the end of the quarter. The second quarter ended on March 31, and Avaya reported its quarterly results on April 19. CW4 reported that Avaya had been offering discounts to an unusually large number of its customers since January. Taken in their entirety, the allegations suggest that Avaya's Chief Financial Officer was, by early March, aware of Avaya's sharply contracting margins, which were crucial to its "story." And as we have said, upon realizing that Avaya's margins were drastically shrinking, it is at least as likely as not that McGuire would have discovered the massive discounting, if he had not already done so.

Defendants suggest McGuire would not have been aware of the "horrid" (as one analyst called them) impending Q2 results in early March because the shortfall was, according to

68

defendants, mostly the product of an unexpected decision by distributors not to "reload" at the very end of March. Although defendants will, of course, have an opportunity to adduce evidence in support of this explanation at a later stage of the litigation, in light of the alleged facts we may consider (and must assume true) at this stage, we find it more likely that unusual discounting explains the disappointing results. "The plausibility of an explanation depends on the plausibility of the alternative explanations. As more and more alternatives to a given explanation are ruled out, the probability of that explanation's being the correct one rises." *Tellabs II*, 513 F.3d at 711 (internal citations omitted). Here, the centrality of operating margins to the "Avaya story," the magnitude and pervasiveness of the alleged discounting, and the proximity of the March statements to the end of the quarter and the release of Avaya's disappointing results, all diminish the plausibility of innocent explanations for McGuire's flat denials of unusual pricing—for example, that developments subsequent to the statements account for the mediocre results, or that the discounting would not have been apparent to McGuire at the time analysts asked about it. As the plausibility of these benign explanations shrinks, the cogency of the culpable explanation—that McGuire either knew his denials of discounting were false or recklessly disregarded the obvious risk of their falsity—correspondingly grows.

Having considered the totality of the particularized facts alleged by Shareholders, we find that the culpable explanation

of McGuire's March discounting statements is at least as compelling as the nonculpable alternatives. Taken together, the extent of the alleged discounting, the importance to the "Avaya story" of maintaining margins, the amount by which the second quarter results missed expectations, the proximity of McGuire's statements to the end of the quarter and the release of results, McGuire's position as Chief Financial Officer, and most significantly, the content and context of the statements themselves, give rise to a strong inference that McGuire either knew at the time that his statements were false or was reckless in disregarding the obvious risk of misleading the public. Accordingly, under *Tellabs*, Shareholders' claims relating to the March discounting statements survive defendants' motion to dismiss.[45]

Defendants' primary strategy in resisting this conclusion is to focus on particular types of allegations and argue for the insufficiency of each. For example, in responding to Shareholders' argument that the temporal proximity of the Q2

---

[45]Of course, these conclusions assume the truth of plaintiffs' allegations and are based only on the limited information we may consider on a motion to dismiss. "Our ruling does not mean that plaintiffs' claims have any merit. It means only that the claims are not to be dismissed at this very early stage. Nothing has been proven yet." *Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 79 (1st Cir. 2008) (internal quotation marks omitted).

2005 results to the March statements bolsters the inference of scienter, defendants contend "[c]ourts reject inferences premised on such proximity rationales." Defendants' Br. 42 (citing *Arazie v. Mullane*, 2 F.3d 1456, 1467–68 (7th Cir. 1993)); *see also id.* at 42 n.16 (citing *Ronconi v. Larkin*, 253 F.3d 423, 437 (9th Cir. 2001), for the proposition that "temporal proximity *alone* is never enough to show scienter" (emphasis added)). Whatever the merits of this approach before *Tellabs*, it is in tension with the prescriptions issued in that case. We are to judge "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 127 S. Ct. at 2509. Given this instruction, we are hesitant to formulate categorical rules about the sufficiency of different types of allegations in the abstract. Each case will present a different configuration of factual allegations, and it is the composite picture, not the isolated components, that judges must evaluate in the last instance. "In assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *South Ferry*, 542 F.3d at 784.[46]

---

[46]For the same reasons that we approve of *South Ferry*'s holistic approach to inference, we decline to follow two recent Ninth Circuit opinions calling on courts to undertake two separate scienter inquiries. According to this proposed analytical framework, courts will first "determine whether any

71

of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009); *accord Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1165 (9th Cir. 2009). Perhaps we misunderstand this new standard, but it appears to graft *Tellabs*'s holistic analysis onto the Ninth Circuit's earlier jurisprudence as an extra layer. If this is true, the result, in our view, misinterprets the Supreme Court's decision, which calls only for "consider[ing] the complaint in its entirety" and explicitly warns against "scrutiniz[ing]" allegations "in isolation." *Tellabs*, 127 S. Ct. at 2509; *see also id.* at 2511 ("In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"). As an earlier Ninth Circuit opinion had recognized, "the *Tellabs* Court's directive that a complaint must be read in its entirety cuts both ways. Although a defendant cannot gain dismissal by de-contextualizing every statement in a complaint that goes to scienter, a plaintiff cannot *avoid* dismissal by reliance on an isolated statement . . . ." *Metzler Inv. GMBH*, 540 F.3d at 1069. Just as facts innocent in themselves may appear more suspicious in the company of other

72

For this reason, we are unconvinced by defendants' attempt to downplay Shareholders' argumentative focus on the "totality of the circumstances alleged." Defendants' Br. 45. "The sum of several zeros," defendants state, "is still zero." *Id.* But inference is not arithmetic. The inferential significance of any single allegation can be determined only by reference to all other allegations.

*The Earlier Statements*

Shareholders have failed to establish a strong inference of scienter with respect to the other statements identified in their Complaint. Each of these statements lacks at least some of the inculpating circumstances surrounding the March discounting statements. The closest case is presented by McGuire's reaffirmation[47] of the earlier financial projections on March 2,

---

facts, so too can a fact that seems damning when presented alone sometimes be explained away by reference to other circumstances.

[47]The parties dispute whether the March statement, which adjusted Avaya's projected revenue growth to 28% due to the earlier-than-predicted close of the acquisition of Tenovis, *see supra* note 9, "increased" revenue estimates. Since the "increase" was solely a result of the early close of the acquisition, which had occurred before the statement, the predictive portion of the guidance essentially reaffirmed the earlier estimates.

73

the same day as one of his pricing statements. On the one hand, the projection of revenue and margins has a less direct relationship to the crucial alleged discounting than does the pricing statements. But because unusual discounting would be expected to diminish revenues and margins, and because we have already found the Complaint adequately pleads scienter with respect to the pricing statements, one might conclude that the financial-projection allegations must also satisfy the PSLRA's requirements.

Unlike the pricing statements, however, the March projections are a classic forward-looking statement under the PSLRA's Safe Harbor provision. *See* 15 U.S.C. § 78u-5(i)(1)(A) (defining "forward-looking statement" to include "a projection of revenues, income (including income loss), . . . or other financial items"); *see also supra* Section III.A.[48] As such,

---

[48]In oral argument, counsel for Shareholders implied the March financial projections were assertions of current fact insofar as McGuire explicitly expressed "comfort" with them. Oral Arg. Tr. 12–13, Mar. 3, 2008 (contending this court has held "that when a company expresses comfort with a projection that that endorses it and it's actionable") (citing *Burlington*, 114 F.3d 1410). We disagree. McGuire's "comfort" about the projection is, of course, a current fact, but the statement about corporate finances remains forward-looking. *Burlington* stands only for the proposition that a corporate officer's expression of "comfort" with an analyst's projections makes those projections

they are not actionable unless Shareholders can "prove that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading." § 78u-5(c)(1)(B). Since this provision specifies an "actual knowledge" standard, the scienter requirement for forward-looking statements is stricter than that for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity. *See Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 200–01 (1st Cir. 1999); *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1283–84 (11th Cir. 1999).

This distinction is fatal to Shareholders' allegations regarding the March projections. With the pricing statements, Shareholders' failure to identify the precise means by which McGuire would have learned of the discounting was not determinative. Even if he had not known his denials of unusual discounting were false, the facts alleged gave rise to a strong inference of recklessness. Assuming the truth of those allegations, we concluded the inference that McGuire's denials

---

attributable to the officer. It says nothing to suggest an expression of comfort somehow renders the statement itself ineligible for Safe Harbor protection. To the contrary, *Burlington* consistently describes the statement at issue as "forward-looking," a "prediction," and a "projection." *Burlington*, 114 F.3d at 1428–29.

75

were knowingly false or reckless was at least as compelling as the possible nonculpable explanations. In the case of the forward-looking statements, however, an inference of recklessness does not avail plaintiffs—that is, it must be placed on the nonculpable-explanation side of the balance when we weigh competing inferences. In light of all the facts alleged, as well as what is not alleged, we find it more likely that the March financial projections were the product of recklessness or other nonculpable ignorance, rather than knowing deception.[49]

Shareholders' allegations regarding the January projections fare no better. In Shareholders' view, defendants' assurances that Avaya was "on track" to meet its financial goals were not forward-looking, as the District Court found, but rather statements of current fact outside of the statutory safe harbor. We have rejected this argument, *see supra* Section III.A, but even if we agreed, Shareholders have not adequately pleaded scienter. The January forecast is a statement about Avaya's overall financial picture rather than specific pricing levels. Furthermore, it is more distant from the end of the quarter and the release of actual results than were the March statements. Most importantly, the January statement was made on the same

---

[49]Our decision to dismiss the allegations concerning the March 2 financial projections is unlikely to be of any practical consequence. Because we have found a discounting statement made on the same day to be well pleaded, the projection statement would not extend the class period.

76

day as the release of Avaya's Q1 results, which, as the Complaint itself concedes, were "in line with, or better than, analysts' expectations." Compl. ¶ 58. Even if these statements were somehow false (which, as we concluded above, has not been adequately pleaded), the most compelling inference would be that McGuire and Peterson did not yet know this and believed that January had picked up where the first quarter had left off.

Shareholders make two arguments in an attempt to avoid this conclusion, but neither is convincing. First, they point to an April statement by McGuire, which they construe as an "admission" that "he was fully aware [of unusual discounting] during the Class Period," even as early as the first quarter. Compl. ¶ 93; Oral Arg. Tr. 6, Mar. 3, 2008. But McGuire's words, as quoted in the Complaint, simply cannot bear this interpretation: "Now, I hear that noise that, yes, we were out with a 30% to 40% discount on a program in last quarter . . . ." Compl. ¶ 93. There is no indication that McGuire was informed of the discounting at any particular point in the past. The statement "admits" only that he was, in April, aware of a discount.

Second, Shareholders rely on allegations that Avaya's sales cycle could be quite long. "Because of Avaya's 6–18 month cycle for completing sales negotiations with its larger clients, it would have been evident to defendants six months in advance that Avaya was forced into offering huge 30–40% price discounts beginning in October 2004 . . . ." Shareholders' Reply Br. 15. The implication is that in order for discounting, or

77

problems with the GTM strategy, to affect Avaya's bottom line in the second quarter, the contracts affected by these issues would have to have been negotiated at least six months in advance, at which point McGuire and Peterson presumably would have known of the problems. This type of allegation might carry some weight if the Complaint provided more specific information about particular contracts, or provided a narrower spectrum of sales-cycle variation. But in light of the fact that the first quarter results met expectations, it is difficult to grant much credit to this allegation. Plaintiffs point to contracts going back as far as October 2003 and tell us only that these contracts had a sales cycle somewhere between six and eighteen months. Plaintiffs then urge us to conclude that somehow these contracts were structured in such a way that the problems lay dormant during the first quarter, not menacing financial results, only to explode and lay waste to revenues and margins during the second quarter. The Complaint's sales-cycle allegations are too vague to support this inference. *See Tellabs*, 127 S. Ct. at 2511 ("[O]missions and ambiguities count against inferring scienter.").

Just as the sale-cycle and post-hoc admission allegations cannot give rise to scienter with respect to the January statements, they fail to save the earlier October statements. We have held that Shareholders failed to plead the falsity of the January and October projections adequately. Even if the Complaint were not deficient on that score, it would not sufficiently allege scienter. The satisfactory Q1 results fatally

weaken any inference of scienter regarding the statement made in January, the first month of the second quarter, and they *a fortiori* vitiate any inference of scienter with respect to projection-related statements made at the beginning of the first quarter itself.

Nor is the inference of scienter any stronger with respect to the October pricing-pressure statements. Even if we grant these statements were false, as we did above, the Q1 results suggest that any unusual Q1 discounts were not significant—certainly, not significant enough to support the conclusion that Peterson and McGuire were aware of them, or were otherwise reckless, at the time of the October statements. Accordingly, the Complaint does not give rise to a strong inference that these statements were knowingly or recklessly false or misleading.

## 2. Motive and Opportunity

Shareholders have also attempted to support their scienter pleadings with allegations of defendants' motive and opportunity to commit fraud. In a case decided before *Tellabs*, we held that plaintiffs may plead scienter "by alleging facts establishing a motive and opportunity to commit fraud, *or* by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior." *Advanta*, 180 F.3d at 534–35 (internal quotation marks omitted) (emphasis added). A showing of motive and opportunity, in other words, was an independent means of establishing scienter, one viable even if

plaintiffs could not allege facts from which to infer defendants' knowing deceit or recklessness. That had been the law in this circuit before the PSLRA was enacted, and after examining "the statutory language and supporting legislative history" of the Reform Act, we concluded "it did not . . . alter the substantive contours of scienter." *Id.* at 534.

This conclusion is no longer tenable in light of *Tellabs*.[50] Even before the Supreme Court's decision, several of our sister circuits had rebuffed plaintiffs' attempts to establish scienter through proof of motive and opportunity alone. As the Seventh Circuit observed:

> The Second and Third Circuits take the position that the [PSLRA] adopted the Second Circuit's pre-PSLRA pleading standard for scienter, and thus plaintiffs may continue to state a claim by pleading either motive and opportunity or strong

---

[50]"Although a panel of this court is bound by, and lacks authority to overrule, a published opinion of a prior panel, a panel may reevaluate a precedent in light of intervening authority . . . ." *Reich v. D.M. Sabia Co.*, 90 F.3d 854, 858 (3d Cir. 1996); *see also Williams v. Ashland Eng'g Co.*, 45 F.3d 588, 592 (1st Cir. 1995) ("An existing panel decision may be undermined by controlling authority, subsequently announced, such as an opinion of the Supreme Court . . . ."), *overruled on other grounds by Carpenters Local Union No. 26 v. U.S. Fid. & Guar. Co.*, 215 F.3d 136 (1st Cir. 2000).

circumstantial evidence of recklessness or conscious misbehavior. The Ninth and Eleventh Circuits disagree, believing that Congress considered, but ultimately rejected the Second Circuit's approach, opting instead for a more onerous burden.

The remaining six circuits that have considered this issue take a middle ground, reasoning that Congress chose neither to adopt nor reject particular methods of pleading scienter—such as alleging facts showing motive and opportunity—but instead only required plaintiffs to plead facts that together establish a strong inference of scienter. We find this position persuasive. . . . The text of the statute states only that the complaint must support "a strong inference" of scienter. Without more detailed instruction, we conclude that the best approach is for courts to examine all of the allegations in the complaint and then to decide whether collectively they establish such an inference. Motive and opportunity may be useful indicators, but nowhere in the statute does it say that they are either necessary or sufficient.

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.* (*Tellabs I*), 437 F.3d 588, 601 (7th Cir. 2006) (internal quotation marks and citations omitted), *rev'd on other grounds*, 127 S. Ct. 2499 (2007).

Although the Supreme Court rejected the Seventh Circuit's interpretation of "strong inference," it left its reasoning about "motive and opportunity" undisturbed. In fact, the Court appeared to endorse this reasoning:

> While it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference, we agree with the Seventh Circuit that the absence of a motive allegation is not fatal. As earlier stated, allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint.

*Tellabs*, 127 S. Ct. at 2511 (internal citations omitted). If the significance of the presence, or absence, of motive allegations can be ascertained only by reference to the complete complaint, then a general rule that motive allegations are sufficient—or necessary—is unsound.

We do not rely solely on this one passage of the Court's opinion. Our conclusion that "motive and opportunity" may no longer serve as an independent route to scienter follows also from *Tellabs*'s general instruction to weigh culpable and nonculpable inferences. Individuals not infrequently have both strong motive and ample opportunity to commit bad acts—and yet they often forbear, whether from fear of sanction, the dictates of conscience, or some other influence. It cannot be

82

said that, in every conceivable situation in which an individual makes a false or misleading statement and has a strong motive and opportunity to do so, the nonculpable explanations will necessarily not be more compelling than the culpable ones. And if that is true, then allegations of motive and opportunity are not entitled to a special, independent status. Instead, as the Seventh Circuit has said, they are to be considered along with all the other allegations in the complaint.[51]

Here, Shareholders' allegations of motive and opportunity do not relate to particular statements but rather purport to bolster a general inference of fraudulent conduct. Shareholders allege that defendants were "further motivated" to inflate Avaya's stock in order to (1) complete a $549 million repurchase of Liquid Yield Option Notes (LYONs) through common stock in November 2004, and (2) secure a $400 million unsecured revolving credit facility on favorable terms in February 2005. Furthermore, Shareholders allege that McGuire

---

[51]The Second Circuit has continued to treat motive and opportunity allegations as a separate category, but it does not appear to have explicitly examined whether that practice is consistent with *Tellabs*. *See ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198–99 (2d Cir. 2009); *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

and Peterson were motivated to make the alleged false or misleading statements because they sold Avaya common stock through March 1, 2005, for personal gain.

Shareholders contend that their "motive allegations are consistent with scienter, even if," standing alone, they "do[] not establish a strong inference." Shareholders' Br. 40. In other words, the stock sales, the LYONs redemption, and the receipt of a $400 million credit facility are alleged to "bolster scienter by providing a coherent reason for fraud." *Id.* at 43. We agree that these allegations provide a plausible motive for fraud, but the bottom-line question is not whether defendants were likely to have a motive to commit fraud, but whether they were at least as likely as not to have acted on that motive and actually committed fraud. For the reasons that follow, we find the allegations of motive presented here do not strengthen the inference of scienter.

On November 18, 2004, Avaya announced it would redeem all of its LYONS due 2021. Pursuant to the terms of these notes, holders had the choice of redeeming the notes with a face value of $1,000 at maturity for a present payment in cash of $545.67, or alternatively the LYONs were convertible into 37.4437 shares of Avaya common stock per $1,000 principal at maturity.[52] LYONs holders were given until December 20,

_____

[52]37.4437 shares of Avaya stock at $14.58 a share equals $545.93. On November 18, 2004, Avaya's stock closed at $16.45. On that date, a LYON redemption would have been

84

2004, to choose which method of redemption, cash or stock, they preferred. Prior to December 20, 2004, holders of LYONs with an aggregate principal amount at maturity of $549 million converted their outstanding LYONs into 20,546,199 shares of Avaya common stock. On December 20, 2004, LYONs with an aggregate principal amount at maturity of $61,000, which represented all remaining outstanding LYONs, were redeemed for cash at an aggregate redemption price of $33,000. Shareholders allege defendants were "strongly motivated . . . to artificially inflate (and maintain) the price of Avaya's common stock" to avoid paying cash for the LYONs.

On February 24, 2005, Avaya announced it had completed a $400 million five-year unsecured revolving credit facility. The new unsecured credit facility replaced Avaya's existing $250 million secured credit facility, scheduled to expire in September 2005. Shareholders allege defendants were motivated to inflate and maintain the price of Avaya's common stock in order to obtain the increased financing on more favorable terms.

According to our pre-*Tellabs* jurisprudence, "[m]otive must be supported by facts stated with particularity, and must

---

worth $615.95. On December 20, 2004, Avaya's stock closed at $17.16. A LYON redemption would have been worth $642.53. During the period between November 18 and December 20, the closing price of Avaya's stock ranged from $15.82 to $17.73.

give rise to a strong inference of scienter." *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 237 (3d Cir. 2004) (internal quotation marks omitted).[53] That proposition is no less true after *Tellabs*, although we no longer make an independent search for scienter on the basis of motive and opportunity allegations alone. "[M]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud." *Id.* (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001)); *see id.* ("In every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction. Such allegations alone cannot give rise to a 'strong inference' of fraudulent intent."); *cf. Tellabs*, 127 S. Ct. at 2511 ("*[P]ersonal financial gain may weigh heavily in favor of a scienter inference.*" (emphasis added)). Here, we do not look at motive allegations alone, but the same reasoning undermines any inference of scienter resting upon general motives to aid the company. Corporate officers always have an incentive to improve the lot of their companies, but this is not, absent unusual circumstances, a motive to commit fraud. Certainly, the

---

[53]In *GSC Partners*, plaintiffs alleged that they purchased notes from Washington Group International, Inc. due to false or misleading statements contained in Washington's circular. Washington used the money raised from selling the notes to purchase another company.

86

LYONs redemption and the acquisition of the credit facility fail to contribute meaningfully to a "strong inference" of scienter here. Both actions reflect merely a general corporate desire to retire debt and raise funds and obtain credit on favorable terms.[54] *Cf. Cozzarelli v. Inspire Pharmaceuticals Inc.*, 549 F.3d 618, 627 (4th Cir. 2008) ("[T]he motivations to raise capital or increase one's own compensation are common to every company and thus add little to an inference of fraud.").

We now turn to the allegations about defendants' stock sales. "[W]e will not infer fraudulent intent from the mere fact that some officers sold stock." *Advanta*, 180 F.3d at 540 (quoting *Burlington*, 114 F.3d at 1424). "But if the stock sales were unusual in scope or timing, they may support an inference of scienter." *Id.*; *see also In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 152 (3d Cir. 2004) (reviewing complaint for allegations that stock sales were "unusual in scope (*e.g.*, compared to their total level of compensation or the size of previous sales) or timing (*e.g.*, compared to the timing of past trades)").

As of October 1, 2004, Peterson owned 5,784,834 shares

---

[54]Furthermore, the LYONs redemption was announced and occurred in November and December 2004—before most of the challenged statements alleged in the Complaint.

of common stock[55] and McGuire owned 1,418,454 shares of common stock.[56] Avaya Inc., Proxy Statement (Schedule 14A), at 15–16 (Jan. 4, 2005). During the proposed class period, Peterson sold 100,000 shares for proceeds of $1,416,500 and McGuire sold 251,760 shares for proceeds of $3,772,094. As a percentage of total shares owned, Peterson sold 1.7% and McGuire sold 17.7%. All 100,000 shares sold by Peterson during the class period were sold pursuant to the terms of a Rule 10b5-1 plan. During the same period of the previous year, Peterson sold 200,000 shares. Similarly, 140,000 shares sold by McGuire were sold pursuant to the terms of a Rule 10b5-1 plan

---

[55]This total includes 4,694,660 stock options, 358,280 shares to be received upon termination of employment with Avaya, 722,934 shares under a deferred compensation plan, and 8,960 shares held in a deferred account. Avaya Inc., Proxy Statement (Schedule 14A), at 15–16 (Jan. 4, 2005).

[56]This total includes 1,300,832 stock options and 111,761 shares owned by a limited liability company in which McGuire's spouse owned the controlling interest and had voting control. McGuire disclaimed any beneficial ownership in those 111,761 shares, except to the extent of his pecuniary interests therein. Avaya Inc., Proxy Statement (Schedule 14A), at 15–16 (Jan. 4, 2005).

and the other 111,760[57] were sold by the LLC controlled by McGuire's spouse. During the same period of the previous year, McGuire sold 236,083 shares.

Shareholders' allegations concerning defendants' stock transactions do not significantly enhance the inference of scienter. Defendants' trading practices remained consistent year-over-year and each retained a large percentage of his common stock holdings in Avaya. Accordingly, the sales do not marginally increase the likelihood that defendants made knowingly false or misleading statements out of a desire for personal financial gain.

### 3. Scienter Conclusion

Although we have discussed each of the alleged facts bearing on defendants' scienter one at a time, we have heeded *Tellabs*'s command to evaluate Shareholders' allegations collectively rather than individually. As we have taken up each allegation in turn, we have added it to the picture painted by the previously considered allegations and asked: How does this addition affect the relative strengths of the culpable and non-culpable inferences?

Having considered all of the allegations of scienter, we reach the following conclusions. With respect to the March pricing statements, the Complaint successfully "state[s] with

---

[57]Garry McGuire, Avaya Inc., Statement of Changes in Beneficial Ownership (Form 4) (Nov. 3, 2004).

89

particularity facts giving rise to a strong inference" that the defendants acted consciously or recklessly in making false statements. 15 U.S.C. § 78u-4(b)(2). The Complaint fails to allege scienter adequately, however, with respect to defendants' other statements.

## D. Section 20(a) Conclusion

Correctly noting that, where there is "no liability for the underlying company [under Section 10(b)], there can be no 'controlling person' liability under Section 20(a)," the District Court dismissed the claims brought under the latter provision. *Charatz*, 2006 WL 2806229, at *20. This conclusion followed ineluctably from the court's finding that Shareholders had not adequately pleaded any violations of Section 10(b). But because, unlike the District Court, we hold that plaintiffs have sufficiently pleaded a Section 10(b) claim with respect to McGuire's March pricing statements, we will vacate the dismissal of the Section 20(a) claims insofar as those statements are concerned.[58] *See Suprema*, 438 F.3d at 284–86. We will affirm the District Court's dismissal of Shareholders' Section

---

[58]Since none of the March pricing statements were made by Peterson, all Section 10(b) claims against him are dismissed. Accordingly, he may be liable only, if at all, as a "controlling person" under Section 20(a). Because the parties have not briefed the issue of whether the Complaint properly pleads a Section 20(a) claim, we leave this issue to the District Court.

20(a) claims with respect to the remaining statements.

## IV.

For the foregoing reasons, we will reverse the District Court's judgment with respect to Shareholders' claims relating to the March pricing statements, affirm it with respect to claims relating to the remaining statements, and remand for further proceedings consistent with this opinion. Our disposition entails a shorter class period than Shareholders propose. Because the Complaint has not adequately pleaded fraud for any statements made before March 2, 2005, the class period can begin to run no earlier than that date.